IRENE DANZI, complainant-respondent,

*v.*

ANTHONY DANZI, defendant-appellant.

[Argued May 26th, 1948. Decided September 3d, 1948.]

*Mr. Irving Mandelbaum* (*Mr. Samuel H. Nelson,* of counsel), for the complainant-respondent.

*Mr. Charles C. Trelease* (*Mr. Joseph T. Brienza,* on the brief), for the defendant-appellant.

The opinion of the court was delivered by

WELLS, J.

This is a separate maintenance suit wherein the defendant-husband appeals from a final decree entered in the Court of Chancery on March 10th, 1948, finding "that the defendant, without any justifiable cause, abandons the complainant and separates himself from her and refuses and neglects to maintain and provide for her and the infant child of the marriage, Marlene, * * * two years of age." The decree awarded custody of the child to the complainant-wife, with right of visitation to the defendant-husband, and directed the husband to pay $18 weekly for the support of the child, together with costs and a counsel fee of $250. At the final hearing, the wife made no request for maintenance for herself, being then gainfully employed; and by the decree the application for her support and maintenance was, on her own motion, reserved until the further order of the court.

The suit is based on constructive desertion by reason of extreme cruelty.

The wife alleges that her husband treated her so cruelly that he compelled her to leave their home and has since refused and neglected to support her and their infant child. This he denied.

"To sustain her cause of action since she separated herself from the defendant and left his home, she must show that she had justifiable cause for leaving him, so as to make her leaving abandonment by him as a matter of law." *Gerhold* v. *Gerhold, 109 N. J. Eq. 635.*

This, the defendant contends, the complainant has failed to do.

The parties were married on December 31st, 1944, and lived together, with some interruption, until February 26th, 1947. Their marital troubles began on their wedding night when the husband learned that his wife could not have sexual intercourse because of a physical condition, which was previously unknown to her. The pain caused by the persistent, unsuccessful attempts of the husband to consummate the marriage made the wife hysterical and him angry, and she says that he threatened annulment proceedings.

During the first eight months of their married life, the parties lived together, not too happily, at his parents' home in West Orange. During this period, because of treatment by physicians of the wife, her physical condition was corrected so that she and her husband could and did have marital relations; and many difficulties and differences causing dispute were fairly well adjusted, although during this same period the wife left the defendant on three separate occasions and went to live with her parents at East Orange. She says this was because of her illness, and at her husband's request, and he says it was because she preferred to live with her parents rather than live with him.

Some time in the month of March or April, 1945, a child was conceived, and, at the solicitation of the wife, the husband in August, 1945, rented and furnished a four-room apartment in Maplewood, New Jersey, to which they moved and in which the child was born on December 16th, 1945.

The advisory master found that they settled down after taking up their residence in this apartment and "were getting

along fairly well until sometime in February, 1947, when the defendant brought his mother and seventeen-year-old brother to live with them."

This statement of the learned advisory master is supported by the testimony of the wife, given on cross-examination, to the effect that from the time she and her husband lived in the apartment (August, 1945) to the time her mother-in-law came to live there (February 1st, 1947) they "got along pretty nicely." She said that the husband took care of her and the baby, paid the rent, gas and electric bills, and gave her $25 per week for the house and food, and in addition used to bring home items of food. However, in answer to the question—"And you were quite happy with him, weren't you?" she replied, "We were never too happy." She said, however, that she had no intention of leaving her husband before his mother and brother came to live in the house.

The inquiry as to extreme cruelty is thus narrowed in point of time to the month of February, 1947, and the advisory master based his conclusions upon events that occurred during that period of time before the wife left (February 26th, 1947) and upon the husband's conduct and attitude toward his wife and child after she left.

There is no dispute that the mother-in-law and her family had been dispossessed in the latter part of January, 1947, and that the husband asked his wife's permission to bring his mother and brother there for a few days, to which the wife consented. There is some dispute as to the length of time her in-laws were to stay. The wife said it was for a couple of days; the husband, that it was for a couple of weeks. This is of no particular importance. In any event, it was mutually regarded as temporary and as an emergency.

The advisory master, speaking of this mother and brother-in-law phase of the case said:

"From the advent of the mother-in-law, trouble developed. These people are of different nationalities and worlds apart in their habits and general outlook. Complainant is of Irish extraction and the defendant is of Italian parentage. The wife complained that her husband's mother immediately took charge of the apartment and excluded her from all household

management. She cooked food in Italian fashion, which was distasteful to her. In addition to all this, the seventeen-year-old brother slept in a room adjoining that occupied by the parties hereto. There was no door between them. The defendant insisted on having sexual relations with complainant while his brother was in the next room, to her great embarrassment. Complainant voiced her objection to these conditions to the defendant, without avail. He not only proved unsympathetic, but told her that she would have to like things as they were. On February 21st, 1947, the complainant went shopping. An old friend of the family observed her burdened with packages and gave her a lift in his car. The defendant's mother found out about this incident and told the defendant about it. He became extremely angry and created quite a scene, in which the mother participated. The complainant charges that at the time in question, the defendant's mother called her a 'bum' and stated that she would put a knife through her. Complainant became hysterical. Her husband told her that she was free to leave if she did not like the way she was being treated. Complainant then insisted that her mother-in-law and brother-in-law leave the house. This they did."

The wife says that, after the quarrel, she, with the acquiescence of her husband, asked her mother-in-law to leave, and she left. Her husband, she said, took his mother out of the house that night (February 21st, 1947) and she ceased to live in complainant's house. There was no testimony that what the mother-in-law said or did to the complainant was instigated by the husband.

The advisory master, further expatiating said:

"The wife is entitled to be the mistress of her own home. She is not required to live with in-laws unless circumstances beyond control of the husband make her so doing, imperative. This was not the case here. The defendant has a married sister with whom the mother could have lived."

There was no testimony that the defendant's mother could have lived with his married sister. On the contrary, the testimony was that the married sister would not take her mother. It would seem that a complete answer to charges based upon

the mother-in-law phase of the case is that she entered the home of complainant and defendant with complainant's consent, remained about three weeks, and left when complainant's consent was withdrawn. The complainant remained in her home about a week after her mother-in-law left. It was, therefore, not her presence that caused complainant to leave the home.

As to the finding of fact by the advisory master concerning the insistence by the husband of sexual relations with the wife while his brother was in the next room, the wife testified that she did not grant her husband's desires, and her husband said there were no sexual relations between him and his wife during this period as she had refused him all relations for two months previous to his brother's coming there.

We do not regard this incident sufficient of itself to constitute extreme cruelty.

After the mother-in-law had left complainant's home and before complainant had left it, another act of cruelty is alleged to have been perpetrated by defendant upon complainant. The advisory master describes this incident as follows:

"On or about the 25th day of February, 1947, the complainant's father came to the house. He was under the influence of liquor. An argument ensued between him and his daughter. The father struck the complainant in the face and a piece of glass entered her eyeball. She suffered considerable pain as a result of this assault and eventually had to submit to medical treatment. All of this happened in the presence of the defendant who not only failed to protest the assault and battery on his wife, but thereafter went out on a drinking spree with his father-in-law."

This evidently made a strong impression on the advisory master as he again refers to it in the following language: "He [referring to defendant] stood by supinely while his father-in-law committed an outrageous assault and battery on his wife and made no protest."

The advisory master is undoubtedly confused as to this incident. There were two incidents involving the complainant's father. The first occurred at the apartment of com-

plainant, who testified that on the Sunday before she left, her father came to her apartment in an intoxicated condition to try to convince her not to leave and she gave him the reason why she wanted to leave her husband and come home, and her father told her she was wrong and slapped her. When asked why her father struck her, she replied: "Because I put Tony's mother out. He said I had no respect for the older people." While it does appear that defendant was home at the time of this occurrence, it does not appear that he saw it, or that he instigated it, or could have prevented it, or that complainant suffered any pain from it.

The second incident occurred later on the same day when complainant took a taxicab and went from her own home to her father's house. What occurred there is for the most part clouded in obscurity but this much is clear, that about ten o'clock that night, complainant returned to defendant's home with a piece of glass in her eye, and defendant said he sent his brother to Newark to get boric acid solution and that he (defendant) administered it to the eye. The complainant said that on that night her father got very angry at her and that she had an "accident" but that it happened in her parents' home and that her father didn't strike her "because of the situation" at her home.

The uncontroverted testimony is that this incident occurred at the home of complainant's parents in East Orange at a time when defendant was at his own apartment in Maplewood. He, therefore, was not present when it happened, and there was no basis for the finding of fact by the advisory master that defendant "stood by supinely while his father-in-law committed an outrageous assault and battery" on defendant's wife, and made no protest.

Counsel for complainant do not depend upon the specific incidents hereinbefore mentioned to constitute extreme cruelty sufficient to justify her in leaving her husband, but they do contend that the combination of these specific incidents with other conduct of the defendant hereinafter referred to constitute links in a chain of cruelty evincing a "definite attitude on the part of the defendant to get rid of complainant," and were sufficient to entitle her to separate maintenance.

The advisory master agreed with this theory and attributed the defendant's conduct to his resentment of complainant's objection to the presence of his mother and brother in their home.

That the case against the defendant actually boils down to what happened after the mother-in-law left is clearly indicated by the following testimony of the complainant:

"*Q.* Prior to your leaving your husband in February, 1947, what if anything occurred between you and your husband? Did you have any arguments?

"*A.* Yes. After his mother left the house, everything was changed. He took over the managing. I wasn't to have any money except 25 cents a day, and my telephone was discontinued. I wasn't allowed to see my parents and the baby wasn't to be taken over, and my friends weren't allowed to see me. * * *

"*Q.* Did you speak to him about changing the conditions?

"*A.* I did. I asked him to make a change in our lives and go back to the way we lived before, but I couldn't live under these conditions."

The inhibitions, alleged to have been placed by her husband, upon complainant, as to her and her baby seeing her parents and friends, proved on cross-examination to be visionary and not real. The husband admitted that there was a dispute over $30 which he claims he gave his wife for household expenses for which she failed to account.

As to the disconnection of the telephone, which complainant attributes to her husband's meanness and spitefulness, the husband gave reasons for so doing. Whether or not they are good, it was within his right not only to manage his own house but to decide whether or not it was advisable to discontinue the telephone. The wife is the mistress in her own house as against all others except her husband, who is the head of the house.

It is significant that on the evening of February 25th, 1947, complainant asked defendant, according to her own testimony, to reconsider her managing the house "in the way we used to do before his people came to live with us. He refused and said it was me that had to make the change and that unless

I wanted to live as he did, I could get out which I did in the morning. I asked him again. He thought I was fooling, and I left."

On February 26th, 1947, she engaged a truck to come to the apartment and, in the absence of her husband, she moved with the child and her possessions to her parents' home in East Orange, and has never offered to return. Her husband says he was at work when his wife left and knew nothing about her intention to leave. It is also apparent that failure to provide was not a cause of the wife's departure. She testified that her husband bought all the food they needed and that there was enough in the house when she left for herself and the baby. Her complaint was that she didn't have the money to do the buying.

There was testimony that when complainant came to live with her parents, she was nervous, unable to eat or sleep, and suffered from severe headaches, and that she was ten or twelve pounds below her normal weight. The proofs, however, are barren of any testimony by physicians that the wife's physical condition was due to the treatment that she received from her husband or that her safety or health was endangered.

The advisory master found that the complainant had made out a case of separate maintenance both as to herself and the child. With this, we are not in complete accord.

We do not think the wife met the requirements of the statute as interpreted by the decisions of our courts entitling her to separate maintenance for herself. Extreme cruelty, as contemplated by the act, *R. S. 2:50–3 (c)*, is such cruel treatment as endangers the health of the aggrieved party, either actually inflicted or reasonably apprehended. *Mac-Arthur* v. *MacArthur, 135 N. J. Eq. 215.* This court said in *Venere* v. *Venere, 137 N. J. Eq. 526* (at *p. 528*), that the jurisdiction of the court to award separate maintenance to the wife is statutory and is governed by *R. S. 2:50–39;* and that "a decree thereunder must be supported by evidence showing the concurrence of two elements: first, that the husband, without justifiable cause, has abandoned his wife or separated himself from her; and, second, that he has refused or neglected to suitably maintain and provide for her."

Citing *Acheson* v. *Acheson, 124 N. J. Eq. 12;* *Fallon* v. *Fallon, 111 N. J. Eq. 512.* When a wife, as in this case, separates herself from her husband, and she claims suitable support under the statute, she must justify that separation by proof of extreme cruelty upon the part of the husband to the same extent as she would be compelled to prove if she were suing for a divorce from bed and board on the ground of extreme cruelty. *Cf. Cavileer* v. *Cavileer, 94 N. J. Eq. 161.*

In justifying his conclusion, the advisory master cited, in addition to the incidents hereinbefore referred to, incidents which occurred after the wife left; namely, that her husband made no effort to induce her to return; that he brought his mother and brother back; that he limited his financial contribution to the wife to $5 per week for the child.

We do not think that these incidents have any bearing on the wife's case. A husband whose wife leaves him without proper justification is not obliged in a maintenance suit to induce her to return. The husband testified that he was willing to have her and the child back, and that, through his counsel, he made overtures for a reconciliation but that the answer that he received was that she didn't want to come back because he was cruel. The defendant stated that immediately upon the wife's return, his mother and father, who had taken his brother's place, would leave.

If the court below was wrong in its determination of the main issue, as we think it was, then the complainant's bill should have been dismissed, as to herself, but this does not apply as to the child, who is an innocent third party. The statute, *R. S. 9:2–3,* provides that the Court of Chancery shall have the same power to make decrees or orders concerning the care, custody, education and maintenance of minor children whose parents are living separately, as if they were divorced, and gives the court jurisdiction to provide for the support of the infant child when, as here, the care, custody and support were issues in the case. *Sermuks* v. *Sermuks, 127 N. J. Eq. 364.* Counsel for the defendant concede that the court below was authorized to make provisions for the child by its decree, although they question the necessity for so doing in view of what counsel designate as defendant's "evi-

dent willingness to discharge his duty voluntarily." We do not think that the amount of $5 per week which defendant has been paying for the child's support, coupled with his failure to visit or manifest any interest in the child since the mother left, spells out "voluntary discharge of duty."

The defendant's real objection is that the $18 per week is an excessive amount to award the complainant for the support of the child.

The complainant is working and making $38 per week, and her mother takes care of the child during her working hours. Defendant thinks complainant should bear part of the maintenance costs. We do not think so. When the award was made, defendant was making $74 net per week. He admits that he had been giving complainant $30 per week for the table alone. Under all the circumstances of the case, we do not consider the amount allowed is excessive for the defendant to pay. Nor do we think the counsel fee of $250 is excessive. This, with the costs, should be paid by the defendant. Admittedly, the sum of $5 a week was not adequate for the support of the child. In order to obtain an adequate amount, it was necessary for complainant to bring this suit to compel defendant to pay a sum sufficient for that purpose.

No objection was made to the awarding of the custody of the child to the complainant with the right of visitation to defendant, and no appeal from that part of the decree was taken.

We are of the opinion that the decree below should be modified with direction to reverse the part thereof which found that the defendant without any justifiable cause abandoned the complainant and refused and neglected to maintain her; and to affirm the part which awarded the custody of the child to the complainant and directed the defendant to pay $18 per week for the support of the child together with costs and a counsel fee of $250.

*For affirmance*—WACHENFELD, EASTWOOD, McLEAN, JJ. 3.

*For modification*—THE CHIEF-JUSTICE, BODINE, DONGES, HEHER, COLIE, BURLING, JACOBS, WELLS, DILL, FREUND, SCHETTINO, JJ. 11.